## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**RICHARD T. GENTRY,**

       **Mr. Gentry,**

       **v.**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social**
**Security,**[1]

       **Defendant.**

**No. 12 C 1965**

**Magistrate Judge Mary M. Rowland**

## MEMORANDUM OPINION AND ORDER

Richard R. Gentry filed this action seeking review of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits under the Social Security Act ("SSA"). 42 U.S.C. §§ 416, 423(d), 1381a. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c). For the reasons stated below, this case is remanded for proceedings consistent with this opinion.

## I. PROCEDURAL HISTORY

Mr. Gentry applied for disability insurance benefits ("DIB") and supplemental security income ("SSI") on November 27, 2007, alleging disability as a result of back problems, with an onset date of April 30, 2006. (R. 168-70, 198). The Social Security Administration denied Mr. Gentry's applications initially and on reconsideration, after which Mr. Gentry filed a timely request for a hearing. (R. 87-91, 93-96, 97-

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security and is substituted for her predecessor, Michael J. Astrue, as the proper defendant in this action. Fed.R.Civ.P. 26(d)(1).

100). On March 9, 2010, Mr. Gentry, represented by a non-attorney representative, appeared at a hearing before an Administrative Law Judge ("ALJ"). (R. 45-82). The ALJ also heard testimony from a vocational expert ("VE"). (R. 75-81).

The ALJ denied Mr. Gentry's request for benefits on June 7, 2010. (R. 28-39). Applying the five-step sequential evaluation process, the ALJ found that Mr. Gentry was still capable of performing light work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) and was, therefore, not "disabled," as that term is defined by the Social Security Act. (R. 39).

The Appeals Council denied Mr. Gentry's request for review on January 19, 2012, rendering the ALJ's decision final. (R. 1-6). Mr. Gentry now seeks judicial review of the ALJ's decision. *Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009).

## II. SUMMARY OF ADMINISTRATIVE RECORD

The record indicates that Mr. Gentry was first treated for back pain at Hinsdale Orthopedic Associates S.C. on January 25, 2002 by Marie Kirincic, M.D., a pain specialist. (R. 407). On January 9, 2006, an MRI of the lumbar spine revealed that Mr. Gentry had severe stenosis at L4-5 and left paracentral disc protrusion with mild stenosis at L5-S1. (R. 302). Mr. Gentry reported that he had stopped working as of April 30, 2006 due to back problems. (R. 198). He had previously been self-employed as a carpenter.

On December 15, 2006, Mr. Gentry was examined by Dr. Kirincic. (R. 312, 314). He complained of ongoing thoracolumbar discomfort and lower extremity discomfort. (R. 312). Mr. Gentry reported that he sometimes had to lie down with

his lower extremity propped up on several pillows. He also reported that it was difficult for him to work in carpentry. (*Id.*). On examination, Dr. Kirincic noted that Mr. Gentry's pain score was 10/10, marked dural tension testing was positive with tight hamstrings, and there was pain on extension with lumbar range of motion. Dr. Kirincic's clinical impression was that Mr. Gentry had L1-S1 annular tears with severe canal stenosis, and mild encroachment on S1 nerve with mild stenosis. (*Id.*). On January 24, 2007, Mr. Gentry returned to see Dr. Kirincic complaining of left lower extremity discomfort with sharp and shooting pain. (R. 311). Dr. Kirincic recommended epidural steroid injections, discogram, and surgical discectomy/fusion. (*Id.*).

On May 16, 2007, Mr. Gentry reported he was involved in a motor vehicle accident with resulting chest discomfort, back pain, and difficulty transferring and walking. (R. 306). On examination, Mr. Gentry had difficulty transferring and ambulating, multiple abrasions, positive dural tension testing with slump sit, and multiple spasms in his cervicothoracolumbar musculature. (R. 307). Dr. Kirincic's clinical impression was that Mr. Gentry suffered a cervicothoracolumbar strain with pectoralis strain status post seat belt injury with chest contusion, and paresthesias. (*Id.*).

On June 13, 2007, in a follow-up session with Dr. Kirincic, Mr. Gentry complained of lumbar pain radiating in both legs, more on the right than the left. (R. 319). Dr. Kirincic noted worsening of Mr. Gentry's pre-existing L4-L5 stenosis. (R. 319). Mr. Gentry also reported that, although he had given up his carpentry

business, he had tried to return to work for a previous employer, but was finding it difficult to keep up with the job. (R. 818).

On July 11, 2007, an MRI of Mr. Gentry's lumbar spine revealed a left paramedian intervertebral disc protrusion moderate at L5-S1, and a central right paramedian disc protrusion with moderately severe spinal stenosis at L4-5. (R. 325-26). On August 1, 2007, Mr. Gentry reported that his back and leg pain had returned to levels existing before his accident. (R. 299). Dr. Kirincic concluded that Mr. Gentry had resolved cervicothoracolumbar strain and pectoralis strain with continued chronic low back pain from his degenerative joint disease and spinal stenosis. (R. 300).

On September 4, 2007, Mr. Gentry was examined by Amanda Kennedy, MS, LCPC. (R. 367). She noted that Mr. Gentry had owned his own construction business, and that he was unable to work since his car accident in May 2007. (*Id*.).

Beginning on September 25, 2007 and continuing through at least July 29, 2009, Dr. Kirincic reported that Mr. Gentry was "unable to return to work" in at least seven different work status reports. (R. 868, 402, 830, 827, 825, 821, 762). On September 26, 2007, Mr. Gentry stated that he had tried to return to work, but that he could not make it more than a week. (*Id*. at 297). Mr. Gentry reported awakening at night due to pain and using a cane and walker for ambulation. (*Id*.). Dr. Kirincic noted that Mr. Gentry's lumbar range of motion was markedly decreased and that there was a sensory disturbance in the left L5. (*Id*.). Medrol and Lyrica were prescribed. (R. 298). On October 19, 2007, x-rays taken with flexion and extension

views showed no evidence of significant instability but showed some motion at the L4-5 level. (R. 322).

On December 14, 2007, one of Mr. Gentry's physicians, Dr. Cary Templin, noted that Mr. Gentry had recently had a discogram, but that the doctor, Dr. Koehn, had not been able to even enter the disc with a needle. (R. 328). Mr. Gentry had severe pain running through his legs and back with needle insertion. (*Id*.). Mr. Gentry had 10/10 pain at all levels despite Lidocaine. (*Id*.).

On February 17, 2008 and again on April 28, 2008, Mr. Gentry reported his daily activities in two separate Disability Reports. (R. 204-11, 235-42). Mr. Gentry reported that he shopped, drove, and was able to feed and get his son off to school. (R. 205, 207, 238). Mr. Gentry could prepare frozen dinners, sandwiches, and snacks. (R. 206, 237). He sometimes had trouble getting out of bed by himself. (R. 236). Mr. Gentry reported that he could no longer work, go boating, or go camping due to his pain. (R. 205). He could not stand or sit for a long time before needing to lie down and also had trouble sleeping. (R. 206, 236). Mr. Gentry reported he could not lift more than five pounds, and could walk for 100 feet or half a block before needing to rest for 10-15 minutes. (R. 209, 240). He reported that he was unable to clean his house, and that he ambulated at home mostly with the use of a cane or a walker. (R. 206, 210, 237).

On March 11, 2008, Dr. Richard Bilinsky, a non-examining state-agency physician, completed a Physical Residual Functional Capacity Assessment on behalf of the Social Security Administration. (R. 345-52). Records from Hinsdale, a

psychiatrist, and a licensed clinical social worker (LCSW) were sent for Dr. Bilinsky's review. (R. 91, 96). Dr. Bilinsky, however, did not specify any medical evidence he used to support his RFC assessment and stated that no treating or examining source statements were reviewed. (R. 346-47, 351). Dr. Bilinsky opined that Mr. Gentry could stand, walk, or sit for about six hours with normal breaks in an eight-hour workday, and lift 20 pounds occasionally and 10 pounds frequently. (R. 346). He found that Mr. Gentry could occasionally climb, balance, stoop, kneel, crouch, and crawl. (R. 347). Dr. Bilinsky concluded that Mr. Gentry had moderately severe stenosis with central right-sided paramedian disc protrusion and annular disc bulging, degenerative changes, chronic pain, and flare-ups, which were becoming more increased due to his accident in May 2007. (R. 352). Dr. Bilinsky opined that the level and persistence of Mr. Gentry's back pain was "felt to be credible." (*Id*.).

On March 26, 2008, Mr. Gentry returned to Hinsdale with a marked flare-up in his low back pain. (R. 376). He reported that he had been sweeping his driveway when his pain intensified. (*Id*.). His anxiety level was heightened. (*Id*.). Dr. Kirincic recommended an interdisciplinary pain program for Mr. Gentry. (*Id*.). On April 9, 2008, Mr. Gentry reported that he had not been able to work because of pain and anxiety. (R. 375). Dr. Kirincic increased Mr. Gentry's prescription for Norco for his pain treatment and added Xanax, Ambien, and Lexapro to treat his anxiety, depression, and insomnia. (*Id*.). Dr. Kirincic concluded that Mr. Gentry was "quite disabled from any work including sedentary." (*Id*.).

On July 10, 2008, Ernst Bone, M.D., a non-examining state-agency physician, completed a Revision of Prior Determination on behalf of the Social Security Administration. (R. 384-86). Dr. Bone concluded that Dr. Kirincic's opinion that Mr. Gentry is disabled from any work including sedentary, was not consistent with objective findings. (*Id*.). Dr. Bone opined however that Mr. Gentry "remains credible." (*Id*.).

On July 28, 2008, Mr. Gentry reported to Dr. Kirincic that he "overdid it over vacation doing a lot of swimming and walking and had to take more of his Norco per day." (R. 799). On September 5, 2008, Dr. Kirincic observed that Mr. Gentry had been out of work for more than a year and that he had marked difficulty with activities of daily living and walking. (R. 405). Dr. Kirincic noted that Mr. Gentry physically could not stand or walk more than several yards and that he used a walker or a cane on most days at home. (*Id*.). Dr. Kirincic also noted that Mr. Gentry occasionally needed double doses of his pain medication, which decreased his cognitive functioning. (*Id*.).

On October 29, 2008, a CT scan of Mr. Gentry's lumbar spine revealed a moderate to severe high-grade annular tear and spinal stenosis at L5-S1. (R. 482). On November 5, 2008, Mr. Gentry was finally able to tolerate a discogram that showed concordant pain at L4-S1 with a high-grade annular tear and a smaller tear at L3-4. (R. 464).

On December 1, 2008, Mr. Gentry was examined by Michael Zindrick, M.D., an orthopedic specialist at Hinsdale. (R. 467-68). Dr. Zindrick reviewed the January 9,

2006 MRI report showing degenerative joint disease with bulging disc at L4-5, and the discogram of November 5, 2008 and the CT scan of October 29, 2008 showing annular tears with concordant pain. (*Id*.). Mr. Gentry reported back pain radiating into his left buttock and leg, which he described as approximately 60% back and 40% left buttock and leg pain. (*Id*.). On examination, Dr. Zindrick found that Mr. Gentry had discogenic back pain with annular tears at L4-5 and L5-S1. (R. 468). Dr. Zindrick noted that Mr. Gentry had pain with flexion beyond 60 degrees, extension beyond 10 degrees, and side bending beyond 20 degrees; diminished reflexes bilaterally; and positive straight leg raising at approximately 60 degrees bilaterally for buttock and leg pain on the left, and on the right for back pain. (R. 467). Dr. Zindrick also noted, however, that Mr. Gentry had no gross weakness; good sensation in all dermatomes to pinprick and light touch; full range of motion of hips; good circulation in the legs; no muscle wasting or atrophy; no lymphedema; good pulses to feet; only mildly antalgic gait; and ability to toe-walk and heel-walk. (*Id*.).

On February 17, 2009, Dr. Kirincic completed a Multiple Impairment Questionnaire. (R. 407-14). Dr. Kirincic noted that Mr. Gentry had chronic and constant pain with occasional stabbing and burning sensations in his low back that ranged from moderate to severe. (R. 408-09). He opined that Mr. Gentry was able to sit, stand, or walk for less than one hour in an eight-hour workday; required breaks to rest every fifteen to thirty minutes in an eight-hour workday; could occasionally lift and carry five pounds but never more; and that his pain, fatigue, or other symptoms were constantly severe enough to interfere with his attention and

concentration. (R. 410-12). Dr. Kirincic also opined that Mr. Gentry would be absent from work more than three times a month. (R. 413). Norco and Tramadol were prescribed. (R. 411). Dr. Kirincic concluded that Mr. Gentry suffered from severe anxiety that contributed to his symptoms and caused him to be incapable of handling even low-stress work. (R. 412).

On March 17, 2009, Dr. Kirincic noted on examination that Mr. Gentry had 10/10 pain with flexion, extension, and side bending; difficulty with heel and toe walking; used a cane for support; multiple spasms; and positive dural tension testing. (R. 479). Dr. Kirincic opined that Mr. Gentry was "unable to continue with [his] work as a carpenter." (R. 769).

On April 30, 2009, Dr. Zindrick completed a Multiple Impairment Questionnaire. (R. 482-89). Dr. Zindrick reviewed an October 29, 2008 CT scan and opined that Mr. Gentry suffered from high-grade annular tears at L4-5 and L5-S1 with significant spinal stenosis at each level. (R. 483). Dr. Zindrick noted that Mr. Gentry had ongoing symptoms that were 60% low back and 40% left lower extremity; worse with bending, twisting, or lifting; and pain with flexion beyond 60 degrees and extension beyond 20 degrees. (R. 483). Dr. Zindrick opined that Mr. Gentry had moderately severe pain; could sit, stand, or walk for less than one hour in an eight-hour workday; and could occasionally lift 5-10 pounds and carry 0-5 pounds but never more. (R. 484-85). Dr. Zindrick concluded that Mr. Gentry was "unable to work." (R. 488).

On July 13, 2009, Mr. Gentry underwent a decompressive laminectomy at L4, L5, and S1 with fusion and bone grafting and cage insertion, performed by Dr. Zindrick. (R. 510-12). In July 24, 2009, ten days after his surgery, Mr. Gentry reported burning in his right leg and increased numbness of his right leg. (R. 503). Dr. Zindrick opined that Mr. Gentry remained unable to return to work. (R. 531).

On September 25, 2009, two months after the surgery, x-ray results revealed that Mr. Gentry had excellent position and alignment of his internal fixation and fusion. (R. 499). On examination, Dr. Zindrick noted that although Mr. Gentry's pain had markedly improved since his surgery, Mr. Gentry had tenderness over his iliac crest bone that was reproducing pain into his right buttock and hip area. (*Id*.).

On December 3, 2009, during a follow up with Dr. Kirincic, Mr. Gentry reported that he had been progressing nicely until recently when he started having spasms and pain scoring 10/10. (R. 542). He reported he could not even complete his physical therapy and could not sleep. (R. 542). On examination, Dr. Kirincic noted multiple muscular spasms throughout the spine. (*Id*.). Dr. Kirincic concluded that Mr. Gentry had myofascial pain. (*Id*.). Mr. Gentry was prescribed a TENS (Transcutaneous Electrical Nerve Stimulation) unit, and his medication was changed from Lyrica back to Neurontin. (R. 543).

On December 16, 2009, Mr. Gentry was admitted to the emergency room at Morris Hospital with increased pain in his low back and lower extremity. (R. 546). MRI results revealed postoperative changes consistent with posterior fusion,

laminectomy of the lower lumbar spine, and worsening inflammatory Modic changes in L4-L5 with no evidence of stenosis or fluid collections. (*Id*.).

On February 3, 2010, Mr. Gentry's physical therapist for work-conditioning observed that although Mr. Gentry engaged in sedentary to light level functioning, he was unable to participate much and had to spend all day in bed after each therapy session. (R. 53). Dr. Kirincic noted that Mr. Gentry had difficulty transferring, very antalgic gait, forward flexed posture, tenderness over his iliac crest, and decreased motion in the spine. (*Id*.). Dr. Kirincic concluded Mr. Gentry had slow progress during physical therapy. (R. 554).

On February 10, 2010, Mr. Gentry reported he was getting around much better on a daily basis including walking, running errands, and performing basic activities of daily living. (R. 41). Dr. Kirincic observed comfortable sitting, standing, and walking, no gross motor weakness, and negative sitting straight leg raising. (*Id*.). Dr. Kirincic also noted, however, that Mr. Gentry had pain beyond 40 degrees of flexion, ongoing low back pain with right leg radiculopathy, and status post posterior spinal fusion. (*Id*.).

On February 17, 2010, Dr. Kirincic noted that Mr. Gentry was still able to tolerate therapy for only two instead of four hours. (R. 558). Dr. Kirincic noted Mr. Gentry's pain score was 5-8/10 and sometimes 10/10 after physical therapy. (*Id*.).

At the administrative hearing, Mr. Gentry testified that he has not worked consistently since the end of 2006. (R. 55-56). Mr. Gentry stated that he originally injured his back in 2002, and that the pain had worsened in 2006. (R. 61-62). Mr.

Gentry was a partner at Gentry Construction for a couple of months before it went out of business later that year. (R. 54-55). Mr. Gentry described experiencing an acute flare-up while sweeping his driveway on March 26, 2008. (R. 55-56). Mr. Gentry stated that he tried working for another employer in 2007, driving a truck and moving boxes of nails, but could not even handle that. (R. 58-59).

Mr. Gentry stated that he has been unable to work because he cannot sit up for more than 45 minutes or stand and walk for 10 minutes before he needs to lie down. (R. 58). He has pain in his back and legs. (R. 59). He cannot lift more than 10-15 pounds. (R. 67). During the day, Mr. Gentry tries to get up and wipe off tables and vacuum in his house, but is not very successful and needs to sit or lie down. (R. 69). He cannot sit and watch TV for more than half an hour before he needs to lie down, and he cannot walk inside a grocery store. (R. 58). On occasion, Mr. Gentry can drive but only with pain medication that makes him dizzy. (R. 69-71). Mr. Gentry also stated that he has had anxiety and depression since he has been unable to work. (R. 61). He takes Norco, Neurontin, Xanax, and Cymbalta for his pain and anxiety. (R. 60). He has been taking Xanax since 2006 and Cymbalta for a couple of months. (*Id*.). He stated that his surgery did not result in any significant improvement in his back pain. (R. 58). Mr. Gentry testified that he cannot read or write. (R. 75).

The vocation expert ("VE") in attendance at the ALJ's hearing opined that an individual with Mr. Gentry's age, education, and work history could not perform Mr. Gentry's past work as a carpenter or a carpenter supervisor, and would instead be

limited to light work that was simple, routine, and repetitive. However, the VE opined that an individual with Mr. Gentry's background and level of functioning could work as a molding machine tender, a core extruder, or a sorting machine operator. (R. 76-77). The VE also opined that if the individual was limited to sedentary work, he could work as an escort vehicle driver, a telephone quotation clerk, or a bench hand assembler. (R. 77). The VE opined that if the individual needed a sit or stand option after 30 minutes, and needed to alternate between sitting and standing at will, the individual would be able to work as a telephone quotation clerk or a bench hand assembler. (R. 79). The VE opined that if the individual were illiterate, he would only be able to work as a bench hand assembler. (R. 77-78). Moreover, if the individual would be off task or require unscheduled breaks three to four times a day, for one to two hours, there would be no jobs available in the regional economy. (R. 80-81). Finally, if an individual would be absent from work three times per month, there would be no jobs available. (R. 81).

The ALJ issued a written opinion on June 7, 2010, finding that, despite severe impairments relating to his back pain and anxiety, Mr. Gentry retained the residual functional capacity to perform light work with certain restrictions, and thus was not "disabled" under the Social Security Act. (R. 30-37).

## III. STANDARD OF REVIEW

To establish a "disability" under the Social Security Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A claimant must demonstrate that his impairments prevent him from performing not only past work, but also any other work that exists in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A).

The regulations under the Social Security Act set forth a five-step process to determine whether a person is disabled. 20 C.F.R. § 404.1520(a)(4). Under these regulations, an ALJ must consider (1) whether the claimant presently has substantial, gainful employment; (2) whether the claimant's alleged impairment or combination of alleged impairments is severe; (3) whether the claimant's impairment(s) meet(s) or equal(s) the specific impairments that are listed in the appendix to the regulations as severe enough to preclude gainful employment; (4) whether the claimant is unable to perform his or her past relevant work; and (5) whether the claimant is unable to perform any other work that exists in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 404.1520(b)-(f); *see also Young v. Sec'y of Health and Human Serv.*, 957 F.2d 386, 389 (7th Cir. 1992).

A finding of disability requires an affirmative answer at either Step 3 or Step 5. *See* 20 C.F.R. § 404.1520(a)(4). A negative answer at any step other than Step 3 precludes a finding that the claimant is disabled. *Young,* 957 F.2d at 388. The claimant bears the burden of proof at Steps 1-4. In cases of severe impairment, the ALJ's analysis typically involves an evaluation of the claimant's residual functional

capacity ("RFC") to perform past relevant work. *See* 20 C.F.R. § 404.1520(e). This RFC is used for purposes of Step 4 to determine whether the claimant may work in his or her previous occupations. *Id.*

At Step 5, the burden shifts to the Commissioner, who must "provid[e] evidence showing that other work exists in significant numbers in the national economy that [the claimant] can do, given [his] residual functional capacity and vocational factors." 20 C.F.R. § 404.1560(c)(2). If a claimant's RFC allows him to perform jobs that exist in significant numbers in the national economy, then the claimant is not disabled. 20 C.F.R. § 404.1520(g)(1).

In reviewing the ALJ's decision, courts may not decide facts anew, reweigh evidence, or substitute their judgment for the articulated judgment of the ALJ. *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994). The reviewing court will uphold the Commissioner's decision if it is supported by "substantial evidence," and is free of legal error. 42 U.S.C. § 405(g) (2004); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Dray v. R.R. Retirement Bd.,* 10 F.3d 1306, 1310 (7th Cir. 1993) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If conflicting evidence would allow reasonable minds to differ, the responsibility to determine disability belongs to the Commissioner (and ALJ, by extension), not the courts. *See Heir v. Sullivan,* 912 F.2d 178, 181 (7th Cir. 1990); *see also Stuckey v. Sullivan,* 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the

authority to assess medical evidence and give greater weight to evidence that the ALJ finds more credible).

However, an ALJ is not entitled to unlimited judicial deference. An ALJ must "build an accurate and logical bridge from the evidence to [his or] her conclusion," *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001), and "must confront the evidence that does not support his [or her] conclusion and explain why it was rejected." *Indoranto v. Barnhart,* 374 F.3d 470, 474 (7th Cir. 2004). The ALJ must consider all relevant evidence, and may not choose to disregard certain evidence or discuss only the evidence that favors his or her decision. *See Herron,* 19 F.3d at 334. Although the ALJ need not evaluate in writing every piece of evidence in the record, the ALJ must state the reasons he or she accepted or rejected "entire lines of evidence." *Id.* at 333; *see also Young,* 957 F.2d at 393 (in order for there to be a meaningful appellate review, the ALJ must articulate a reason for rejecting evidence "within reasonable limits"). The written decision must include specific reasons that explain the ALJ's decision, so that the reviewing court can ultimately assess whether the determination was supported by substantial evidence or was "patently wrong." *Zurawski v. Halter,* 245 F.3d 881, 887 (7th Cir. 2001) (quoting *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000)).

## IV. DISCUSSION

Mr. Gentry argues that the Commissioner's denial of his social security claims must be reversed because the ALJ improperly rejected the opinions of Mr. Gentry's treating physicians. The Court agrees.[2]

By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). In fact, the opinion of a treating source is entitled to *controlling* weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. §§ 404.967(d)(2), (3), (4), 416.927(d)(2), (3), (4); Social Security Ruling (SSR) 96-2p (in order to be entitled to controlling weight, a medical opinion must be rendered by a treating source, be well-supported by medically acceptable clinical and laboratory diagnostic techniques, and also must not be inconsistent with other substantial evidence in the record).

Before rejecting a treating physician's opinion, an ALJ must offer "good reasons" for doing so, and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2)). Also, an ALJ may not selectively discuss portions of a physician's report that support a finding of non-

---

[2] Mr. Gentry also argues that the ALJ failed to properly evaluate Mr. Gentry's credibility and relied on flawed vocational expert testimony. Because Mr. Gentry's treating physician argument is dispositive, the Court will not address his other two arguments.

disability while ignoring other portions that suggest a disability. *Myles v. Astrue*,

582 F.3d 672, 678 (7th Cir. 2009).

In this case, two of Mr. Gentry's treating physicians, Drs. Kirincic and Zindrick,

opined that Mr. Gentry lacked the capacity to perform any gainful work. The ALJ

gave those opinions little weight because, he reasoned, they were unsupported by

the record and overly reliant on Mr. Gentry's subjective complaints of pain:

> I must give little weight to these assessments by Drs. Zindrick and
> Kirincic, as the extreme limitations noted therein are patently
> unsupported by the record. Treatment notes from both physicians fail
> to document such levels of dysfunction, specifically the claimant's
> needed absence from work as well as intolerance to sitting and
> standing. Furthermore, these assessments appear to be based more on
> the claimant's subjective allegations rather than any objective
> findings.

(R. 34).

The Court finds that the ALJ lacked a legitimate basis to reject Mr. Gentry's

treating physicians' opinions. Contrary to the ALJ's assessment, over the course of

treating Mr. Gentry for eight years, the physicians at Hinsdale (primarily Drs.

Kirincic and Zindrick) developed ample objective medical evidence, as partially

described below.

On January 11, 2006, Dr. Kirincic compared a recent MRI report to an October

27, 2004 MRI report, finding that there had been a "definite progression" of Mr.

Gentry's disorders, including two annular tears with severe canal stenosis. (R. 416).

X-rays performed soon thereafter revealed five non-weight bearing vertebra to Mr.

Gentry's AP projection, settling of the disc at L4-5, and severe degenerative disc

disease at L5-S1. (R. 417). On May 16, 2007, Dr. Kirincic observed Mr. Gentry

experiencing serious difficulty transferring and ambulating. (R. 307). On June 13,

2007, Dr. Kirincic again observed Mr. Gentry's "difficulty transferring and

ambulating," noting also that "dural tension testing is positive with bilateral slum

sit. There is marked sensory disturbance in about L4-L5, mainly L5, distribution,

left more than right," which indicated "worsening of his pre-existing L4-L5 stenosis

. . . ." (R. 319). On September 26, 2007, Dr. Kirincic again examined Mr. Gentry,

noting that he ambulated with a cane in marked distress and was unable to tolerate

dural testing with "slump sit." She also noted a markedly decreased lumbar range

of motion and sensory disturbance in L5, L4-S1 with abnormalities/protrusions (R.

297-988). On December 14, 2007, Mr. Gentry's physician observed significant disc

degeneration with a bulging disc at L4-5 and L5-S1, annular tears with dye contrast

leak into the L4-5 and L5-S1 disc space. In fact, she was unable to enter the disc

with the needle due to severe pain radiating to the left with needle insertion despite

lidocaine. (R. 328-29). On December 16, 2009, Mr. Gentry was rushed to the

emergency room at Morris Hospital after reporting increased low back pain and

lower extremity pain. An MRI was taken, which was forwarded to Dr. Kirincic, who

noted that it showed "postoperative changes consistent with posterior fusion,

laminectomy of the lower lumbar spine, and worsening inflammatory Modic

changes." On March 17, 2009, Dr. Kirincic noted that Mr. Gentry's lumbar range of

motion indicated sacroiliac joint dysfunction, which was then confirmed with dural

tension testing. (R. 479). She also observed his chronic back spasms on multiple

occasions. (R. 479, 542-43). On February 3, 2010, Dr. Kirincic observed difficult

transferring, as well as a very antalgic gait with a forward flexed posture. (R. 553). On February 3, 2010, Dr. Kirincic conferred with Mr. Gentry's physical therapist, who said Mr. Gentry was not able to participate in therapy much and had to spend all day in bed following his attempts at therapy.

Thus, contrary to the ALJ's description, the medical records contain substantial objective evidence of Mr. Gentry's impairments. While it is true that Mr. Gentry's subjective complaints of pain surely factored into his physicians' opinions, those complaints were supported by objective testing and consistent with the record as a whole. *See McClinton v. Astrue*, No. 09 C 4814, 2012 WL 401030, at *11 (N.D. Ill. Feb. 6, 2012) ("Almost all diagnoses require some consideration of the patient's subjective reports, and certainly [the claimant's] reports had to be factored into the calculus that yielded the doctor's opinion."). Thus, it was an error for the ALJ to conclude that the treating physicians' opinions were unreliable because they rested primarily on Mr. Gentry's subjective complaints of pain.

On remand, the ALJ must reconsider whether Mr. Gentry's treating physicians' opinions are entitled to controlling weight in light of the objective evidence noted above. In the event the ALJ finds, again, that those opinions are not entitled to controlling weight, he must consider the factors listed in 20 C.F.R. § 404.1527(c)(2)(i-ii) (length of the treatment relationship and frequency of examination, nature and extent of the treatment relationship) and (c)(3-6) (supportability, consistency, specialization, and other factors) when determining what weight to give them. Finally, because the ALJ's residual functional capacity

assessment was inconsistent with the treating physicians' opinions, any enhanced weight given to the treating physicians' opinions should also result in reconsideration of Mr. Gentry's RFC.

## V. CONCLUSION

For the reasons stated above, and pursuant to 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: March 6, 2014

MARY M. ROWLAND
United States Magistrate Judge